We have first from Mr. Holtz, when you're ready. Good morning, and may it please the Court. This is a interesting case, so to speak, and I think there are some very interesting new issues that the Court will be able to address in this matter. This is a tuition reimbursement case brought pursuant to the Individuals with Disabilities Education Act, and one of the main issues, as has been briefed, relates to the new Supreme Court decision, and I say new, it's for March of last year, but the We are arguing as appellants . . . Do you agree that if we determine that the private school was not an appropriate school, for want of more precise terminology, we don't have to address the issues of procedural and substantive idea violations? I would agree because of the two-pronged standard under Burlington and Carter. Yes, I would agree, Your Honor, and I would like to address that issue momentarily with regard to that private school placement and the findings. With regard to that issue, I believe that the . . . and it's been well briefed, but I believe that the findings of the hearing officer, because the Federal District Court did not address the issue, but the findings of the hearing officer, even if you take them as true, and we don't believe that they're accurate or correct, but even if you take them as true, none of those findings made that program inappropriate. The child was placed at Briarwood School in the Tuttle School Program. She has a significant developmental disability. The program, the Briarwood School, is an outstanding school. It's probably the best school, of course, in the Houston area for educating children with disabilities. The Tuttle School is specifically designed for educating children with Ellis' type of disability. So my understanding from the hearing officer is her concern was she didn't believe it to be individualized. Well, the U.S. Supreme Court in Carter basically said IEPs are not required in private schools, so it doesn't technically have to be individualized. Well, I think . . . I'm sorry, go ahead. I'm sorry. I didn't mean to interrupt you. But the evidence was actually to the contrary that it was individualized. So if the court looks at the record, the testimony from the administrator and the teacher, it clearly indicates that this was individualized to meet her needs. As I recall, the hearing officer, and again, I certainly stand to be correct, had found that the child had regressed her educational abilities, had regressed at this private school. My understanding is what transpired is that . . . Is that correct? Is that what the hearing officer found? I don't believe so, Your Honor. I believe that what she was saying was that they put her in a program, for example, the reading program, that the hearing officer was saying she was at a first grade level, but when she went to the new school, they put her back at the reading program, which is the kindergarten level. I don't think there was any finding of regression. I don't recall that. I think what she was saying is that it was too low of a program for her at that point in time. But the issue is this. Once the parent places the child in the private school, which happened in January, it's just . . . You have a new school. You don't know where this child is functioning academically. And so did what she should do, which is start doing an assessment and trying to make that determination. And in her view, going back and reviewing information or reviewing a reading program is appropriate. It certainly did not harm her in any way. And of course, then she moves on, and by the end of the . . . By the time that we had the testimony in September, she had already excelled and was in the first grade level with the reading program. To me, that does not render the program, the private school program, inappropriate. Nor did the fact that one of the arguments with regard to occupational therapy, there's case law specifically on that point, that a private school that does not provide occupational therapy, it's not required to do so under the Burlington-Carter analysis. So I think when . . . And as I said, this is briefed in my response to the summary judgment motion and in my motion for summary judgment. We don't look at what you brief in the district court. We look at what you brief here. You can refer to various papers in the district court. We don't look to those. Well, again, it's going back to . . . I mean, this is unusual to the extent that when you come up to the Fifth Circuit, we don't have a ruling yet. We didn't receive a ruling from the federal district judge with regard to this issue. She didn't found it necessary because she had ruled there hadn't been procedural and substantive violations. Correct. When I say she, Judge Gilmour adopting the 75-page report and recommendation of the magistrate judge. Yes. And we believe, as you pointed out, that the decision is legally incorrect, particularly under the new standard of injury. And we've asked the court to apply what I call the roadmap that's been pulled from the Andrew decision in making substantive faith determinations in the future. Another major issue in this case is the fact that the parent was excluded from involvement in the preparation of the present level of academic achievement and functional performance portion of an IEP. And that's with regard to the fact that there is this guidance document, a question and answer document that the Texas Education Agency has assisted in promulgating throughout the state that talks about you can limit IEP development to only critical areas of need. Nowhere in the IDA is it defined that way. And in fact, I cite to the FRI, the U.S. Supreme Court decision in FRI, about how they indicate that an IEP has to address all areas of need. And so the argument has been that what a school district should do, and our committee should do, when it is trying to determine, particularly for a global legal aid child, you've got to take out the state standards, which I put into the record, and go over those with the parent. And in fact, I sent a Rule 26J letter with a citation to an underlying document for that guidance provision, which says that exact same thing. And so that's what happened here. Basically, we have a PLAF that is wholly insufficient. In Andrew, the court talks about the PLAF has to be, it's a fact-intensive process. Well, you can simply look at the PLAF in this case and tell that it's not fact-intensive. Well, just from reading the briefs, I inferred that this child was being taught to read the book, that she was going to some sort of science class, that she was learning life skills, and I mean, isn't that part of, she was doing math. Why isn't that all, isn't that sufficient for a PLAF? What do you need, test scores? I mean, what is your idea of an adequate PLAF? Well, an adequate PLAF, Your Honor, is one that contains all the material information you need for goal development. Okay, you need to determine what the child's needs are, what the child's potential is. But wasn't the school indicating that they were pushing her ahead? I mean, I read Andrew to say this has to be an ambitious, what is the word for it? It's not a legal term, but appropriately ambitious guidelines, and those had to do with moving toward second or third grade level reading in math, right? What's not appropriately, why does the PLAF not conform with that? Well, there were two primary issues that just stuck out to me. One was, where is the child reading goal? Where, you know, she had one the previous year, you know, she was reading, she'd already, they said she knew 100 sight words and we're going to teach her another, it was 40 sight words for that previous year. All of a sudden, we come up to this IEP, she has no reading, no reading goal, other than for fluency or comprehension, nothing to improve her basic reading skills, her basic reading vocabulary. But didn't the parents sign that IEP, did they not? They did, but what happens is they bring in the IEP, the record shows, they bring in the PLAF and the IEP and they sit down and they say, okay, here's what we're proposing. And the parents, if you don't, if you've already cut out most of the standards, then what's the, and the parents aren't aware of that, because you've limited it to what they consider critical needs, then what's the parent to do? They can only agree to what they're aware of. And in this situation, yeah, they agreed to this, not knowing that, in effect, or not realizing that, well, where's her reading goal? You know, they have a reading goal for fluency, but that's not measurable. They have a reading goal for what I'll call comprehension, and again, that's not measurable, because the PLAF doesn't contain the baseline data that's necessary in order to measure it. How do you know that that, and I'm just inquiring, how do you know that that standard is any different from the standard for the mainstream kids? In other words, you're teaching them certain words from time to time, but in, and they can pick out words on a page, but when they get into second and third grade, they're supposed to learn more words and get into fluency and comprehension. Correct, because the special ed students are entitled to that same general education curriculum. Well, that's what I'm saying. Are those words, in fact, different from the kind of goals that you would have if it was a mainstreamed kid? Well, they're different in that whenever you're going to provide specialized instruction, you're modifying the, you have to modify the curriculum, either the content, the methodology, or the delivery of that instruction, and whenever you do that, you're supposed to craft an IEP goal, so if you're modifying the instruction, and that was the argument in this case, that for this child, she's globally delayed. She cannot be educated at her grade level in any subject, so why did they not, why did the art committee not sit down, go through everything, and say, okay, in history, this is what she's going to learn. This is going to be the goal in history. This is where she's at. With her learning disabilities, I give her a great deal of credit, because I have grandchildren in public school, and they're not doing much history. Right, but that's a state standard. Those standards are there, history, geography, and in fact, when she went to the private school, she memorized all the 50 states. She could learn, a good ability to learn. That's her potential, and when you look at the IEPs that were crafted, and they were only crafted out of this PLAF, that to me is one of the worst PLAFs that I've ever seen, to be honest with the Court, because there's really very little or no information in that at all from which to develop appropriate IEPs for this child. I mean, what was so difficult for me to grasp in this appeal was all these, first of all, I'd never heard of a PLAF before, now I know, but it's not in the record excerpts, I don't believe, and I just don't under, well, maybe, I'm sure it's in the record somewhere, but I wasn't, just saying it's inadequate didn't mean a lot to me, so you're, I apologize, then, Your Honor. Yeah. It's the present level of academic achievement and functional performance, which is part of the IEP definition for goal development. Right. And that's supposed to be done with the parents at an ARD committee meeting, and again, procedurally, to me, that's one of these major issues, that procedurally, they didn't do that. And because they didn't do that, the parents were significantly impaired in, with regard to the decision-making process, the development of this IEP, which renders it inappropriate. And, in fact, you know, the record is replete with basically what transpired after that fact, but, and how she ended up at Frostwood Elementary School. The, that's one of the issues, of course, is whether or not there was a change in placement that I'd ask the Court to review. All right. Thank you. You have time for rebuttal. Thank you. Okay. Mr. Rush. Good morning, and may it please the Court. Turning directly to your question to the appellant, Judge Barksdale, the hearing officer did find that ER had regressed at Briarwood. An express finding of hearing officer was that she was reading at the first grade level at Frostwood and then regressed at Briarwood, that she was performing more complex math problems at Frostwood than she was at Briarwood. And so the hearing officer, after having heard the testimony of all the witnesses, made the factual determination that there was regression and that the program was not sufficiently individualized because Briarwood used the same program for all students without giving any specific focus. The hearing officer's finding that Briarwood was not an appropriate placement is correct. And to your point, because the placement was not appropriate, even if the Court were to find that there were procedural or substantive violations of the IDEA, as appellants conceded, they would still lose. Because this action is to recover the cost of the private school tuition. Correct, Your Honor. And so not being able to satisfy that final prong of appropriate placement, even if we start at the very end, the appellants cannot prevail. But if we start at the beginning as to whether there was a substantive violation of the IDEA in the first instance, appellants have not shown that either. Much of appellants' briefing goes to the question of whether or not Andrew F. modified the NIEP, an individual education plan, as appropriate. The District is of the position that Andrew F. did not modify the law in this circuit and that this circuit 20 years ago, at least in the Michael F. case, articulated a standard that rejected the de minimis standard that was at issue in Andrew F. The law has not changed in this circuit. And I think the Court can fairly easily dispense with the arguments that there's a change in law that necessitates a new review or a new look at this record. Because Andrew F. merely embraced the standard this Court had reached long before Andrew F. that NIEP had to be calculated to give meaningful benefit, meaningful progress, and had to be more than de minimis. So there's no need to take a fresh look under new law because our law in this circuit was accurate. If anything, Michael F. gives us a test to find out whether or not the Andrew F. standard has been met. And the District Court here applied that Michael F. test in reviewing the hearing officer's determination, as did the hearing officer. And what primarily heard today from appellants was that the PLAF was inadequate. And he focused on the allegation that there were no reading goals. And in the PLAF, which is located in the IEP, and it's on page 2 of the 33-page document, the first goal mentioned is reading. And it identifies ER strengths and it identifies her needs. So it's plainly within the PLAF. Now, appellant seems to suggest that the school district and the parent should sit down and draft the PLAF from beginning to end at the ARD meeting. But bear in mind, the teachers and school officials who are members of the ARD committee, which includes the teachers, school officials, professional evaluators, and the parents, they have a wealth of information from their day-to-day interactions with the student and are positioned to know exactly where that child's functioning. There's an economy of being able to allow the educators to prepare a draft or a discussion document that can be discussed. And as Judge Jones noted, the parents signed off on this IEP. They had no objection to the substance of the IEP as drafted. And these parents are, and this shines through in the testimony, highly sophisticated, knowledgeable, and involved parents. They knew what they could and could not object to or ask for, but they were happy with what was provided by the school district. Just for our recording and to give us a baseline here, what's the date of the IEP to which you're referring? It is the April 24, 2014 IEP. My apologies, because there are two in the record. There's the April 24, which is the IEP that was initially challenged in this action, and then there's an August IEP from 2015, which was the second IEP prepared by the district after ER was withdrawn from Frostwood. But looking at that class in the IEP, appellant fails to cite any authority that would tell us that it is insufficient. At most, appellant argues that the district erred by focusing on the students' critical needs and failed to include every strand of the state standards, the Texas Essential Knowledge and Skills Standards, the TEKS, which contain, as the hearing officer and district court recognized, over 120 different strands of knowledge and information that typically would be mastered in the general education curriculum. Here, given the undisputed nature of ER's academic performance and ability to attain academic performance, it would have been somewhat fanciful to include all of those strands at this point when you have a child who's still struggling to learn basic reading concepts. To your point, Judge Jones, adding in history when the reading focus was the ability to independently read level text and state two things about the text. The father testified that ER could not relay information about her day. She would say everything was wonderful and lovely and then tell a story from something that had happened weeks ago. With this child, focusing on those critical needs was entirely appropriate and entirely individualized. There's some irony in the idea that every plaque should cover every single strand of the available education because that's not individualized. That would actually be fairly pro forma, and here wouldn't serve the needs of the student at issue. Given the involvement of the parents and their opportunity, both at the ARD committee meeting to interject or question and raise any concerns about the IEP that was developed in April 2014, it's striking that they did not. Isn't there language in some of the Fifth Circuit cases about de minimis progress? Pardon your honor? Isn't there language in some of the Fifth Circuit cases about de minimis progress being sufficient? I think there is language in the cases that holds that there has to be, the IDEA doesn't require maximization or it requires a nominal benefit, but Michael F. here, the case that Appellant strictly challenges in the case on which the hearing officer and the district court relied expressly rejects the idea of a de minimis standard. Well, it says positive academic and non-academic benefits, right? And then it goes on and says it's more than merely de minimis. Okay, well maybe that's what I was thinking of. And so Michael F. rejects that standard that the Tenth Circuit had embraced. Given that factor, I really don't think that Michael F. has been overruled, certainly not expressly. It's not mentioned in the Supreme Court's decision, and it would be difficult to conclude that it was overruled by implication when the two cases are not incompatible. The Supreme Court in Andrew F. held that the standard in Rowley that was traditionally applied or was plainly applied for students who could be based in the general education curriculum would apply all the way across the curriculum and that while Rowley and Andrew F. didn't develop a test, they rejected the Tenth Circuit's de minimis standard. Well, we already have a standard that's above that. And so the appropriate standard was applied here, and even looking to the facts, given the articulation in Andrew F. that it needs to be an appropriately ambitious program for the student, again, we look at the particular student. And here, looking at E.R., given the undisputed nature of her condition and her level of academic attainment up to that time, the IEP and the goals were appropriately ambitious given where she was, given her other health impairments, her medical condition, and her IQ score. What do you say about the court's peremptory rejection of their request to submit additional evidence? Your Honor, I think that the district court was correct in that regard. This court has never squarely addressed what constitutes additional evidence and when it should be permitted and when it should not be permitted. While the statute provides that the court shall consider additional evidence, district courts in this circuit, both the Southern District and the Western District, have written opinions on the subject of additional evidence and held that the meaning of additional must be something more than the nature of a do-over or evidence that is cumulative or available below. I think that's the appropriate standard that was appropriately applied here. One of the points that Appellant did not really articulate today in the briefing, I'm sorry, in his oral argument today, but he complains of purported procedural violations in the IEP's generation, and I've addressed most of those today, but the court, of course, knows that the factual findings of the hearing officer are reviewed for clear error. Nowhere in the briefing or today did Appellant articulate how there was clear error, how the hearing officer who heard the testimony and judged the credibility of the witnesses erred clearly in such a way that this court should reverse, and I think that that failing is telling. The only finding that the hearing officer made against the district was the procedural violation of not identifying how ER's condition affected her learning abilities in one particular area of the IEP, but the hearing officer determined that that was essentially a harmless error because a procedural violation standing alone does not create a substantive violation of the IDEA. The procedural violation has to lead to a denial of fate. Here, looking at the IEP as a whole, even without that information in that one particular box or section, the IEP as a whole tells us exactly how ER's condition affects her learning abilities. So in this instance, we don't have a substantive violation or substantive harm. So that's not a basis to reverse. The hearing officer in district court correctly articulated the law on that point. And finally, appellants devote a substantial amount of their briefing to the idea that the district violated the IDEA by changing the location of ER's program. This court has already twice addressed the idea that a school district can move the physical siting of an educational program without offending the IDEA. The program is the instruction that's being delivered, not the physical location or a specific person or teacher. This court, both in the White v. Ascension and the Weill v. Board of Elementary and Secondary Education cases, both of which are cited in our briefs, held that a school district does not create a substantive denial of fate by changing the location of a program. And here, like the Weill case, it was the same IEP being implemented just in a different physical location. And with that, if the court has no further questions for me, I will... I guess not. Thank you. I will request that the court then affirm the judgment below and return my hand to court. Okay. Mr. Holtz? Your Honor, counsel started out by pointing out the particular IEP and the, what I'll call the plaf again, present level of performance. And, of course, he cites to the record, and he says, the first thing they talk about is reading. He pointed that. Let me just read it real quick. ER answers questions about text, read or adopted, level text she reads in sections. She answers who, what, when, where questions. We've given up to three choices. She makes personal connections to stories. That's her strengths. What does she need to do? She needs to read independent level text and give main idea with two supporting details. Needs to increase her fluency and write sentences with appropriate size and spacing. That's the extent of what we got for reading. Nowhere in there does it tell you, what's her reading level? Was it, you know, was she at a kindergarten, eighth month level? Was she at a first grade level? There's nothing in there. There's nothing about how many sight words. Does she know 140 sight words and now want to have a goal where she's going to know 200? That's the type of thing that you typically see in these types of proceedings, and it's simply not here in this plaque. Now, you're telling us that's the type of thing you see in these proceedings. Is that in the record or is that based on your experience? I guess that would probably be based on my experience because we didn't put an IEP from another student into the record, Ron, and, you know, I do have a substantial amount of experience. But the situation is this. When you look at the—all you have to do is look at this particular plaque and you can determine that it's inadequate, fully inadequate, because there is no baseline data from which you can develop these goals and objectives. I can't recall. Did the hearing officer go over the plaque and point in response to your saying this is inadequate or that is inadequate or what did the hearing officer say about the plaque? Really, it's my recollection there's really not much in there. It's just kind of an overall general determination that the IEP was appropriate. After the hearing was over, we submitted closing statements. That's when this guidance document was put in by the counsel for the school district, the TEA guidance document that talked about these critical areas of need that then the federal court then used as part of its decision in talking about it, saying it's not authority, but, you know, this is where this information came from. You know, your brief focused quite a bit on this term critical needs, and I did not understand. I read the whole magistrate judge opinion, and I just didn't think that was a significant part of her thought process, that the IEP was limited to critical needs. Well, our position is, Your Honor, again, we go back, and I know he criticized about the number of strands and things like that, but the definition of an IEP requires that it meet the state standards. State standards for every student include this broad range of subject and materials. The only way you can draft a fact-intensive, which is what Andrew says it's supposed to be, a fact-intensive present level of academic achievement and functional performance, is by pulling this information together, exposed to be done at an ARD meeting according to the definition, to what's required for a FAPE and what's required for an appropriate IEP. So it all is supposed to be done at that location. We certainly don't have a problem with them bringing in a draft and then working from that and going over it, and if they're going to exclude a particular area, and that's where this critical issue comes from, that they're going to exclude a particular area, the parent needs to be informed of that and have some decision-making. What did they exclude? I've heard you say they were excluding her present level of academic achievement. They were excluding subject areas in all the subjects. For example, as a point out, there's no reading IEP. There's no history IEP. There's no social, there's no spelling. There's no personal finance. They actually identified in their math, in the math plaf, her need for learning coins, but then they didn't develop a goal for it. So, I mean, there's a substantial amount of violations, so to speak, of this IEP in its development from the inception back in April, and that's how we believe the court should rule, is that the IEP as developed at that point in time was not reasonably calculated to envision the type of progress that's now required under Andrew. All right. We're aware of our scope of review, which is virtually de novo, so we will look at it closely. Thank you, Your Honor. All right. Thank you, sir.